IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

**MARINE CARRIERS, INC.**                                                         **PLAINTIFFS**

**VS.**                                      **CIVIL ACTION NO. 1:05CV51**

**TOM SOYA GRAIN COMPANY and**
**JACKSON WOOD FIBER, LLC**                                           **DEFENDANTS**

## ORDER

On November 14-15, 2005, this court sat as trier of fact in the trial in the above-entitled action. Having considered the testimony, exhibits and arguments of the parties, the court is now prepared to rule.

This is a maritime action arising out of a March 7, 2004 barge breakaway on the Port of Aberdeen (hereinafter the "Port") on the Tennessee/Tombigbee Waterway. On March 6, 2004, the M/V Tombigbee, operated by plaintiff Marine Carriers under the charge of Captain Whoeler, was traveling downstream pushing a tow on the Tennessee/Tombigbee Waterway north of the Port. It had orders from its customer, Jackson Wood Fiber, to pick up two loaded log barges at the Port. The Tennessee/Tombigbee Waterway was experiencing flood conditions on the night of March 6, 2004 and the early morning hours of March 7, 2004. Prior to the M/V Tombigbee arriving at the Port, it was contacted by Lee Hood of Jackson Wood Fiber, who requested that while in the Port area, the crew of the M/V Tombigbee shift three barges there. After securing the barges in its tow to the river bank below the Port, the M/V Tombigbee proceeded back upriver to the Port, then transported two barges, one at a time, to the tow.

The boat then proceeded to shift the three barges as requested by Jackson Wood Fiber. The crew of the boat was assisted in mooring the three barges by employees of defendant Tom Soya Grain Company (hereinafter "Tom Soya"), which leased and operated the north part of the Port from the city of Aberdeen. At some point that night, the M/V Tombigbee finished rearranging the tow and proceeded downriver. At approximately 7:15 the next morning, Captain Whoeler was notified that the three moored barges had broken away. Captain Whoeler expressed disbelief that this could have happened, and he proceeded back to the Port to confirm this for himself. Upon satisfying himself that the barges had, in fact, broken away, Captain Whoeler proceeded to search for the loose barges downriver. Captain Whoeler found a partly loaded barge grounded at Mile 245, an empty barge at Mile 341, and a fully loaded barge grounded at Mile 338.5.

As a result of this incident, Marine Carriers, Inc. filed a claim against Tom Soya and Jackson Wood Fiber for damages to two barges, salvage costs for one barge, loss of use of one barge, and other miscellaneous damages. Tom Soya filed a counterclaim against Marine Carriers for damages in the sum of $42,813.44 incurred during barge recovery operations. Trial in this matter was held on November 14-15, 2005, with this court sitting as trier of fact.

## ANALYSIS

Counsel for plaintiff and defendants tried this case diligently and have submitted carefully prepared proposed findings of fact and conclusions of law. The court appreciates their efforts. In the court's view, however, these submissions do not alter the fact that neither party submitted credible proof which might establish, by a preponderance of the evidence, why or how the three barges broke from their mooring at the Port of Aberdeen on March 7, 2004. Despite attempting greatly to do so, the court was never able to discern any consistent theory from either party as to

what caused the barges to break away. The parties each submit that certain presumptions should apply which might impose liability against the other party, but, in the court's view, any such presumption is inappropriate, considering that it seems more or less equally likely that the barges broke away due to the negligence of either party, as a combination of both parties' negligence, or simply due to unknown acts of nature and/or of third parties (such as mischief or vandalism).

The court does not recall a trial in which the central issues of the case remained so unclear, following the testimony of numerous witnesses, as the present one. The evidence demonstrated that employees for both Marine Carriers and Tom Soya were involved in docking and/or mooring the barges in question, and the court does not find it significantly more likely that the employees of one party were more responsible for the breakaway than the other. At trial, a great deal of largely irrelevant testimony was offered regarding the manner and order in which various barges were towed, arranged, and re-arranged at a location below the Aberdeen port. There was also a good deal of largely inconsistent or unclear testimony regarding the exact manner in which the three barges which eventually broke away were moored to a deadman at the Port of Aberdeen. At no point, however, was any proof offered which even came close to establishing exactly why and how the barges broke away.

Plaintiff attempted to demonstrate that the breakaway was likely caused by the headline having been tied to the H-beam under the direction of Tom Soya, thus resulting in the line being scraped and cut by the metal surface of the beam. Plaintiff notes that Tom Soya maintained and oversaw the mooring lines and wires used to moor barges at the upper mooring area, and it argues that Tom Soya should bear responsibility for the breakaway. However, there was never any evidence presented at trial which supported this theory by a preponderance of the evidence. Indeed, plaintiff never settled on a single precise theory in this regard, instead offering various

alternative theories regarding what "may" have happened assuming that the headlines was tied to and/or scraped against various parts of the deadman. Moreover, plaintiff improperly sought to buttress its "rope breakaway" theory by having its expert witness testify regarding the substance of a *phone conversation* which he had with a representative of the manufacturer of the headline in question. Obviously, the alleged statements of the rope manufacturer's representative are hearsay, and plaintiff should have called the representative to testify if it wished to buttress its theories in this regard.

For its part, Tom Soya argued that it was the crew of the M/V Tombigbee which was negligent in this case. In particular, Tom Soya contends that the "M/V Tombigbee easily could have, but did not, put a deckhand ashore onto the riverbank, to conduct a careful visual inspection of the headline from the deadman all the way to the end to be tied to the empty barge and also to verify the headline's attachment to the deadman." Tom Soya also argues that the crew was negligent in failing to employ a second breastline which had previously been used. Plaintiff rebuts that Tom Soya "decided exactly what type of headline to use ... and how and where to secure the line to the deadman." Tom Soya concedes that its own mooring expert Warren Sizemore "criticized Tom Soya's attachment of the headline to the deadman by tying the line directly to one of the steel H-beams of the deadman," although it maintains "that the attachment of the headline to the H-beam had nothing to do with the three barges breaking away."

In the court's view, each side succeeded in offering roughly equal amounts of plausible speculation suggesting that the negligence of the other party might have caused the initial break-away of the barges. However, without any indication as to *why* and *how* the barges in question broke away in the first place, there is no rational way to assign relative culpability in this regard.

If there was any moment at trial which epitomized the frustration which this court felt in ascertaining the true facts concerning the barge break-away, it occurred at the very end of trial. At trial, the court had expressed mounting frustration with the fact that there had been a great deal of testimony presented, but none of it amounted to anything more than speculation regarding what caused the barges to break away. Nevertheless, the court did note that Tom Soya had brought with it to court what was represented to be the actual headline involved in the breakaway in this case.

This court expressed its hope that this crucial piece of physical evidence might somehow shed light upon secrets that the muddy waters of the Tennessee-Tombigbee had heretofore kept hidden. Initial inquiries in this regard did not appear promising, however. As discussed *infra*, while there did appear to be rust on the surface of the headline at the location where it was cut (thus arguably supporting plaintiff's theory that it scraped against the deadman), this rust appeared to be at a location well below the place where one would expect any scraping against the deadman to have occurred. Nevertheless, the court still had hopes that the headline would produce some insight into the causes of the break-away in this case.

These hopes were dashed in plaintiff's rebuttal case when, in something of a "Perry Mason" moment, plaintiff's expert showed a photograph of his earlier inspection of the headline, at defendant's facility. Plaintiff's expert testified, and the photograph appeared to show, that at least one segment of the severed headline which had been sitting in the courtroom during trial was not, in fact, the same headline which had been offered to him for inspection during discovery. Indeed, the photograph of the earlier inspection showed a severed headline which appeared to be bound at both end with black tape, while one end of the headline which had been sitting in the courtroom was bound by red tape. Counsel for Tom Soya inspected the headline

and photograph but never succeeded in casting doubt upon the rebuttal testimony of plaintiff's expert.

Up until this testimony, the court felt that, while neither party had proven its case, Tom Soya might have come a bit closer in this regard than plaintiff, due largely to testimony that, in the hours after the breakaway, the crew of the M/V Tombigbee may have been negligent in failing to keep a proper lookout and that such might have prevented them from noticing the loose barges floating by their towboat moored downriver. While this testimony did not serve to shed light on what caused the barges to break away in the first place, it did arguably present some proof regarding whether the towboat would have been able to retrieve one or more of the barges and thus reduce damages, once the breakaway had occurred. In the court's view, however, Tom Soya did not adequately follow up on this testimony with proof establishing the extent to which a proper lookout would have retrieved the situation. Moreover, the court is reluctant to grant Tom Soya the benefit of the doubt in this regard, due in part to the fact that it appears that Tom Soya employees submitted a crucial piece of evidence at trial, at least part of which was inauthentic.

The court has no reason to believe that Tom Soya employees intentionally sought to deceive it, but the fact remains that the headline was brought into court as the central piece of physical evidence, yet it now appears that at least one segment of the headline is different than the one which was actually involved in the breakaway in this case. Based upon inspection and comparison of the headline segments with prior photographs, it seems likely (but is not certain) that the remaining segment of the headline is, in fact, genuine. However, this portion was severed approximately 21 feet from the end of the rope, and it accordingly does not appear to support plaintiffs' theory that the breakaway resulted from friction between the headline and the deadman. There is, in fact, rust at the area where the apparently genuine segment of headline

was severed, and this would seem to support a conclusion that the breakaway may have been caused by contract with some rusted surface well below the area where the headline was tied off. However, neither party's theory of the case would appear to account for such an occurrence, and the court can only speculate as to what might have caused it.

Given that the central events of this case remain almost completely unclear, the court concludes that the proper result at this juncture is for each party to bear their respective expenses incurred to date and to take nothing in this action. This result may appear inelegant, but, following a trial which shed very little light upon the central events of this case, such an outcome appears proper as a matter of law and equity.

It is therefore ordered that each party take nothing in this action, and this case is dismissed with prejudice.

SO ORDERED, this the 27th day of December, 2005.

    **/s/ Michael P. Mills**
**UNITED STATES DISTRICT JUDGE**